**AMERICAN FIRE AND CASUALTY COMPANY, Appellant,**

v.

**Charles E. (Charley) BRAMLETT et al.,
Appellees.**

**No. 16903.**

United States Court of Appeals
Fifth Circuit.

March 4, 1958.

H. A. Stephens, Jr., Palmer H. Ansley, Atlanta, Ga., Smith, Field, Doremus & Ringel, Atlanta, Ga., of counsel, for appellant.

Cecil D. Franklin, Marson G. Dunaway, Jr., Rockmart, Ga., for appellees.

Before HUTCHESON, Chief Judge, and JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Bramlett was the Assured under a standard automobile liability policy issued by the Insurer covering his pick-up truck. Mrs. Hulsey was injured when she fell from or was thrown off the truck as the Assured was attempting to get the truck out of a ditch. By its suit for declaratory judgment against both Assured and the Hulseys as potential damage claimants, the Insurer sought a determination of non-liability on the sole ground that Mrs. Hulsey, at the time of her injuries, was an employee and thus not covered by reason of the Employee Exclusion clause:

"This policy does not apply:
"(d) * * * to bodily injury * * * or death of any employee of the insured arising out of and in the course of * * * (2) * * * employment by the insured" [1]

The Insurer now appeals from a judgment entered on a jury verdict adverse to it. It forthrightly recognizes the heavy burden that, at this stage, it must demonstrate that Mrs. Hulsey, as a matter of law, was such an employee.

We think it fails because there were jury issues on whether (a) she was an employee at the time, (b) she was acting as an employee at the time, (c) the employer agreed to furnish transportation as a part of the contract of employment, (d) transportation was being furnished as a part of the employer's obligation rather than as a mere permissive convenient gratuity, and (e) at the time of the injury, she was being transported, as such, rather than assisting in getting the truck into position for use in transportation to commence thereafter.

At the outset it is appropriate to point out that the *facts*, i. e., what was said, or done, are simple indeed. But it is their simplicity which inevitably makes most, if not all, a jury question as a trier, Court or jury, seeks to draw inferences on the nature of the agreement, the scope of the implied obligations, or the many other legal incidents which have now become so important but which, in fact,

---

1. This is apparently the industry-wide 1955 uniform clause to replace previous forms, many of which were couched in terms of "while engaged in the employment" or "business" of the Insured, or variables thereof. See Risjord and Austin, Automobile Liability Insurance Cases, 1957, pp. 25–26; and see Chapter 35 "Liability Coverages—Exclusions—Employee," p. 174, which abstracts many of the contemporary cases on "Employee Exclusion." Some Courts have seemed to find in the different terminology a decisive difference in effect, e. g., Passmore Metal & Roofing Co. v. New Amsterdam Casualty Co., 10 Cir., 147 F.2d 536, 537; Southern Farm Bureau Casualty Ins. Co. v. Bohls, Tex.Civ.App., 304 S.W.2d 534, 537 (error ref'd n. r. e.).

never passed through the actors' minds in this little homely transaction to pull cotton bolls.

Bramlett was a small cotton planter. About three years before November 1956, Mrs. Hulsey had picked cotton for him, then apparently on his own place, a half mile and in walking distance from the Hulsey's home. On a Saturday in November 1956, Mr. Hulsey, on seeing Bramlett in town, casually inquired whether Bramlett would be picking cotton since his wife, Mrs. Hulsey, would like to pick some for him. Nothing definite was said, but each must have thought that a bargain had been made for Bramlett showed up on the following Monday morning at the Hulsey home and asked Mrs. Hulsey whether she wanted to pick cotton.

Enveloped in this silence was the subject of transportation. For whatever doubts there might be on other matters, it is uncontradicted that *nothing* was said about that[2] at all. The Insurer's efforts to prove that the parties themselves "understood" that transportation was to be furnished failed simply because, as the Trial Court pointed out in repeated rulings acquiesced in by the Insurer, these three individuals could not testify to any secret "understanding" which neither communicated to the other. The circumstances, about which

---

2. The Insurer, of course, had to make its case out of Bramlett, its Assured, and the Hulseys.

Bramlett testified:

"Q. When you discussed this cotton picking with Mr. Hulsey on Saturday there was nothing said about transportation, was there? A. No, sir.

\* \* \* \* \*

"Q. Now, Mr. Bramlett, at the time that you talked to Mr. Hulsey and when you didn't mention transportation, it was your intention to take Mrs. Hulsey to and from the field, was it not? A. Well, yes, sir, I suppose so.

"Q. It was understood more or less that you would do that, isn't that true? A. We didn't have any understanding at all about it."

Mr. Hulsey's knowledge was confined to the Saturday conversation:

"Q. And at the time that you discussed your wife picking cotton for Mr. Bramlett, nothing was said about how she would get to and from the field? A. No, sir.

\* \* \* \* \*

"Q. Well, now, at that time \* \* \* it was understood by you that if Mr. Bramlett had any cotton to pick, that he would either ask you to take Mrs. Hulsey to the field, or you knew that Mr. Bramlett would take her to the field, is that correct? A. Well, we didn't have nothing, no understanding of that, but I figured that she would get to the field somehow, and—" [cut off by an objection sustained by the Court].

Of course, the jury, in passing on credibility, heard and had the right to consider extracts from written statements obtained by the Insurer and used presumably as prior inconsistent statements or admissions.

About them, Bramlett testified:

"Q. Do you remember making this statement to me [Insurer's attorney]? A. Yes, sir.

"Q. 'It was generally understood that the rate was to be two dollars per hundred pounds plus transportation in the morning and evening.' A. Well, I said it was customary. I told you, it was just customary, I had it down that way.

\* \* \* \* \*

"Q. And you also said this, didn't you, 'You have to haul the cotton pickers or else you just can't get them to work.' A. Lots of times, now, we spoke that way, we might not have wrote it down that way but we had it, you know, it is the general custom to haul them, lots of them went in their own cars, come backward and forwards, if it wasn't."

Later on he testified:

"Q. Now, on cross examination you were asked by [Insurer's counsel] whether or not it was customary for the people who picked cotton for you to ride to and from the place where the cotton was, and you said that it generally was customary. A. Yes, sir, generally with other people, and so on, you know.

"Q. Do you mean by that answer that when you provided in the contract of employment that you would carry them back and forth, that under those circumstances it was customary, and that when you didn't mention it in the employment, that it was not customary for them to ride back and forth? A. I think so. I think that is the way, wasn't getting no pay, nothing like that for riding back and forth, nothing like that, wasn't supposed to, they could do as they pleased, yet there wasn't no argument about it."

they could testify freely, might permit a legal inference of an "understanding," but the parties could not here state what it was.

Returning now to the Monday morning, when Bramlett arrived at her house, Mrs. Hulsey said she would like to pull cotton, but would have to fix her lunch first. Bramlett, with several others then in the truck, waited some fifteen minutes until Mrs. Hulsey fixed her lunch at which time she also got on the truck. Again nothing was said about transportation and especially about transportation back that evening. It is uncertain whether Bramlett, at that time, advised any of them where the cotton was to be picked, although it is undisputed that the truck took them to the Moore place some four miles away where Bramlett had a small tract under lease.

At the Moore place they pulled bolls, quit temporarily for lunch, resumed work, and then quit about 4:00 p. m. At this stage the trial was a running factual battle on whether cotton pickers are employees or independent contractors. In our disposition of the case, we treat this and all of the incidental labored effort on the test of "direction and control" as superfluous.

After the picking ceased, Mrs. Hulsey and the others stood around for about half an hour while Bramlett and his wife weighed up the cotton and loaded it into the truck. Mrs. Hulsey had pulled 150 lbs. and for this she was paid [3] $3.

Bramlett had earlier parked the truck so that one side of it was in a rather deep ditch or incline. In any case it was leaning so much toward the left that he thought the truck might turn over when he put it in motion. Consequently he "asked" or "suggested" or "told" several of the women including Mrs. Hulsey to stand on the right running board. As the truck started ahead and came up on the roadway, Mrs. Hulsey either fell from or was thrown off the running board causing rather substantial injuries. While some words of Mrs. Hulsey expressly stated that in getting on the running board she was doing so to ride home, the jury was certainly justified, from Bramlett's testimony, in drawing the inference that this was preparatory to the homeward trip since the truck was headed in the wrong direction. He had first to get the truck out of the ditch, and then proceed down the roadway a short distance, turn around, come back, pick up the rest of them, and then proceed in that direction toward their homes.

We think that there was ample basis for the general verdict of the jury against the Insurer.

There was first the question whether there was any agreement about transportation. Certainly none was expressed. Whatever it was came about by circumstances by which it was implied. These were equivocal both in nature and permissible inferences. Did Mrs. Hulsey, or possibly Mr. Hulsey as her contracting agent, understand that transportation would be furnished, and as furnished, it would be a part of the employer's obligation? Or did they understand that Bramlett was not obliged to provide transportation, although he might supply it as a convenience to some or all of the pickers? On the other side, did Bramlett intend to imply that he would supply transportation as a part of the contract and for which he would be liable by way of added compensation or reimbursement of out-of-pocket expenses if, for example, he had failed to supply it? Or was this a neighborly voluntary gesture which he could easily afford to do since he had to get his truck to the field to haul the cotton back and would have to inform the pickers where the field was located?

We may assume that the jury could have inferred that transportation was to be furnished as a part of the contract and had it done so, the finding would have been unassailable. But surely from this elusive informal transaction a choice

3. That the contract to pull cotton was nearly 99.44% implied is demonstrated by the fact that Bramlett never mentioned to Mr. or Mrs. Hulsey what the *rate* would be.

was open. On what would we base a conclusion that the jury's inference had no substantial support? On the words said on Saturday or Monday? On Bramlett's investigative statement rather than his testimony? On the circumstance that Mrs. Hulsey would not likely walk four miles and needed the truck to locate the field?

These and similar considerations set this case apart from Johnson v. Aetna Casualty & Surety Co., 5 Cir., 104 F.2d 22, and others like [4] it in which the trier (there the Court) "was warranted in concluding that the transportation was an implied term of the employment. The distance from the homes of the men to the work was so great that transportation must have been considered by both employer and employee. The ride was not for the mere convenience of the employee after his work was done, but was for the forwarding of the employer's work in that it was necessarily provided to get these employees for the very moderate wages paid them" Johnson v. Aetna Casualty & Surety Co., supra, 104 F.2d at page 23.

■ Likewise, assuming that transportation was to be furnished as a part of the contract, the evidence authorized variable inferences as to whether this injury was one "arising out of and in the course of * * * employment [5] by" Bramlett. Was she hired to drive, help drive, maintain or repair the truck? Was she employed to help counterbalance the truck at her master's direction? Was she compelled to heed Bramlett's "request" or "suggestion" in such connection? Was she required to do anything more than pull the cotton, put it on the sheet and tie it for weighing? On what basis could we hold that the jury was compelled to find that this and many other activities related to the repair or operation of the truck at the field or on the homeward journey which readily suggest themselves were a part of the work for which she was hired, and for which she could hope only to be paid at a piece rate for cotton picked, perhaps hours before?

■ Finally, there were similar choices open on the question whether this accident occurred during transportation (assuming it to have been a part of the contract of employment). The jury may well have inferred that the assumed transportation was not to commence until the truck shortly returned headed in the right direction. If she was not on the running board for the purpose of transportation, her presence could not be an incident to the assumed contract to transport. Her presence then could be accounted for only on the basis of doing

4. See, e. g., Hartford Accident & Indemnity Company v. Hudson, D.C.Ky., 124 F. Supp. 666; State Farm Mutual Automobile Ins. Co. v. Brooks, 8 Cir., 136 F.2d 807; Campbell v. American Farmers Mutual Ins. Co., 8 Cir., 238 F.2d 284. The employments and activities in those cases were more regular and continuing, not as here sporadic and irregular.

Illustrative of cases in which the trier holds, as a fact, that the agreement to transport did not exist are: Banks v. Associated Indemnity Corp., 5 Cir., 161 F.2d 305, 310, 314; Farm Bureau Mutual Auto. Ins. Co. v. Smoot, D.C.W.Va., 95 F.Supp. 600; Francis v. Scheper, 326 Mich. 441, 40 N.W.2d 214; State Farm Mutual Auto. Ins. Co. v. Skluzacek, 208 Minn. 443, 294 N.W. 413; Hardware Mutual Casualty Co. v. Ozmun, 217 Minn. 280, 14 N.W.2d 351; Green v. Travelers Ins. Co., 286 N.Y. 358, 36 N.E.2d 620, reversing 260 App.Div. 116, 21 N.Y.S.2d 216.

5. In Banks v. Associated Indemnity Corp., 5 Cir., 161 F.2d 305, at page 313, supra, we pointed out, that "The liberal interpretation of the workmen's compensation law as set forth in the Osborne case may not be further stretched to cover the present case or to justify a judgment contrary to and notwithstanding the jury verdict." The Texas Court, in Southern Farm Bureau Casualty Ins. Co. v. Bohls, 304 S.W.2d 534, supra, at page 539, as did the Ninth Circuit in Getlin v. Maryland Casualty Co., 9 Cir., 196 F. 2d 249, 251, 50 A.L.R.2d 73, quoted in footnote 1 of the Texas opinion, likewise emphasized the distinct difference between the considerations in the construction and application of Workmen's Compensation Acts to injuries received by employees in the course of transportation furnished by the employer and those construing or applying exclusions to coverage in private insurance contracts.

something else. And this would lead the jury right back to the basic question: was she obliged as an employee to do this "something else"?

The case in all of its facets was one of fact. The jury, under applicable legal standards set forth in the Court's charge which all accepted, answered it against the Insurer. There it ends.

Affirmed.